All right. First, down to business. First case for argument is 23-2050, In Re. Vetements Group AG. Mr. Lynn, whenever you're ready. Thank you, Karen. Terrence Lynn for Vetements Group. This case is fundamentally about the doctrine of foreign equivalence. The standard is set forth by this bird in Palm Bay and others such as In Re. Spirits is whether an ordinary American officer is likely to stop and translate the mark in question. If the likely to translate test is only applied to those... Excusez-moi, j'ai une question. You know, I wish I'd spoken. I'd probably have more insight. So, on page 20 of Vetements' opening brief, Vetements argues that French is spoken in the United States by significantly less than 1% of the population. And, quote, that this establishes there is only a low probability than an ordinary American purchaser, ellipsis, would stop and translate Vetements into English. And the PTO doesn't dispute the record citations. But in the same evidence that Vetements cites, it also indicates that approximately 2.1 million Americans speak French at home. I suspect principally in Louisiana and in Maine. Yeah, but that makes it the third, fourth, or fifth most widely spoken foreign language at home. And French is the second most widely taught foreign language in the schools in the United States. And I know from experience, starting in the second grade, that the very first thing they teach little kids is the parts of their body. And then they teach them what they put on their body. The lobe, the jupe, the penteron, right? And they group that under Vetements. So, in the second week or third week of the very first classes French students are getting, that word is there. And that has to impact how many people are familiar with that word. So, your restriction to 2.1 million native French speakers is outside the box as far as I'm concerned. Well, there's two aspects to it. You've got the raw statistical number or raw number. And if you're going to look at less than half of a percent of the American public, does that make it likely that the American public, the ordinary purchaser, is going to translate? Yes, there is this small subset. We don't disagree that, you know, French is a modern thing. Will those people know that word? It's the second most taught foreign language. If the second most taught foreign language involved one person, is that enough? So, what do we do with that? We have this doctrine that we've long applied, including our predecessor court. And French is number two on the list. Spanish, I presume, is number one. So, are we going to limit the application of this doctrine that we've adopted, not as a firm rule, but at least as kind of a background principle to just one language? I mean, I don't even know if Spanish in your outline would satisfy the test. But if that doesn't satisfy it, then there's nothing to this foreign language doctrine, right? It's empty. Well, you can't disregard the low percentage, but you then have to look at the other factors to take that minor percentage into account. And specifically, the market players. Where's the authority for that? Well, Tia Maria was the context. Bistow-Herr, right? It's the context of the marketplace that causes, as laid out in Pompeii and In Re Spirits, that there's certain words that, even if you are a French speaker, it won't be translated, or it's not going to be translated. That's a different question, though. That's more of a context-dependent inquiry. The first threshold question is, is this a modern common language that we can then think about the foreign equivalence doctrine and translate that word into English? And we have this unbroken line of precedent going all the way back to 1933 in paper mills, where if it's a modern common language and you're trying to use as a U.S. trademark the foreign equivalent word that's generic or descriptive for the goods and services, you don't get to have that mark. You don't get to lock up that mark and block competitors from using that foreign word. That's nothing more than a generic or descriptive understanding of the goods and services. So, yes, there are exceptions, but the default rule has always been that there's this ordinary American consumer, but ordinary American consumers include people that speak this modern common foreign language, and then you look at it through that person's eyes as to whether or not they would see that this is, in fact, just a foreign version of a generic understanding of the goods. So I don't understand why we need to worry about calculating what percentage of the overall American population actually speaks and knows French. That's never been the way we've funneled the inquiry, nor is it the way any other circuit court does it, nor does McCarthy suggest that you have to do that. So I guess what I'm trying to figure out is why are we trying to do this kind of, you know, inspection of the overall population like you want? Because the courts have used that as part of the factors or a touchstone when doing an assessment as to whether it's gonna be, yes, whether it's a modern common language, but also whether the ordinary American purchaser would be likely to do the translation. They do look at that, and that is, in fact, what the board... None of our CCPA cases have been overruled, right? I don't believe so. I'm not aware of that. So those CCPA cases, they pretty much just do the translation, whether it was Hungarian or some other foreign language, and then determine whether the now-translated Hungarian word was merely generic or descriptive of the goods and services. Oh, but your court has done far more than that. It takes a look at it through the lens of not just in focusing solely on the foreign language speaker, which would exclude 99.5% of the population. But it looks at... Are you talking about in race spirits? Which case are you talking about? When you said this court's case law has done much more than that. Well, Palm Bay talks about, in the context... Well, there are certain terms that even a French speaker, forget the percentages, just would accept and use. There's a number of cases where... Palm Bay is really quite a different case, though. There was no descriptive or generic thing. This was widows. It wasn't descriptive of the product involved. So it was... I know there's language in Palm Bay that you could argue supports your position, but it was a completely different kind of analysis. But go ahead. Okay. And fair point. That was a likelihood of confusion case as opposed to the descriptiveness. But this court has applied the test even-handedly across both those types of backdrops. Besides, I can testify personally that Veuve Clicquot Champagne has a picture of the widow on every single bottle top. Far more knowledgeable about that champagne than I. But I'll take your word for it. That said, the court's precedent looks at the third-party context of the marketplace. What do the third parties do in marketing and purchasing of products? You talk about Holushka, the Henry Weiss case. In that case, the record reflected that third parties in fact used Holushka, the foreign language word, in marketing their products in the United States. When you talk about the Cordua, that was one where they didn't apply the foreign language doctrine, but it established that the third parties, again, used this Choruska as a type or form of restaurant. Not the translated word, but the foreign language word. And in this backdrop, here, there is no third-party use of Vedemans in marketing their products. I mean, to the extent that this is used. Vedemans in French means clothing, right? The translated meaning is that, yes. And the goods and services here are clothing. They're clothing items or garments of various types.  In terms of the marketplace analysis, when would that term be translated or not translated? Even by a French person. What about queso? Could someone try to get a registration for queso for cheese and cheese products? No, because the third-party use uses the word queso, the foreign language word. We have to look at something called third-party use to ask ourselves whether queso is generic for cheese? To know whether it's the translation of cheese, yeah, that's fine. But to determine whether it is generic in the American public, you should be looking at whether the American public or the marketplace uses that term to refer to that category of product. And it does. I mean, if you go into a coffee shop, you're gonna say, give me a latte. And that's a foreign language word that people just use. Here, the term Vedemans, whether it's on a hang tag that's hanging on a shirt or in the insole of a shoe, people don't look at it and say, geez, I wonder what this is. They aren't using that word to try to tell them something. They're not trying to learn something about the product and therefore they translate it. Part of the evidence reflected displays at department stores, whatever, with a Vedemans carpet with racks of garments and Vedemans is on the side and Vedemans is on the floor and hang tags. And for a person to walk in and say, wait a minute, this is where the clothing is sold. Forget the rest of the store. People aren't looking at that and saying, oh, thank goodness, I found the clothing. No, they're seeing that and the- What evidence do you have of that? The use that I'm talking about is that the appendix 170 to 173. In terms of my expression of what, this is what they would think, that's supposition on my part. Yeah, it is. You're into your rebuttal. You want to hear from, let's hear from the government. Or you want to use it and make another point, that's fine. I think the two points are, it's fundamental that third parties do not use that term. The only evidence is a single third party registration that's now expired where Vedemans was not displayed. Everything else is talking about, well, the efforts of our client to make that or establish that brand. Thank you very much. Thank you. We'll be separate members of Congress. Thank you. Good morning, please proceed. Good morning, your honors. May it please the court. Vedemans is the French word for clothing and appellants goods and services are clothing and online retail store services. There's no question that Vedemans is the direct and literal translation of the word clothing and that clothing is generic for clothing and online retail stores featuring clothing. And as your honors pointed out, it is a foundational principle going back to 1933 with Northern Paper Mill and 1960 with Weissnudel that the foreign equivalent of a generic or descriptive English word is no more registrable than the English word itself. Do we just immediately, blindly, rigidly go look at the foreign dictionary or is there some other analysis that has to take place first? For example, I don't know, is it a super obscure foreign language or maybe something about the context of the desired usage of the mark where we have to ask ourselves, would someone even think about stopping and translating the word before making some assessment to genericness and descriptiveness? No, your honor, it is not just immediately going to the translation. As you pointed out earlier, threshold is, is this a common modern language? And that is what the board did here. They looked at the record and they determined that French is a common modern language and with that finding, they then looked at, is French, in French, vetements means clothing, is that the direct and literal translation of clothing such that the ordinary American purchaser, the purchaser who is knowledgeable or proficient in French would see vetements on clothing and think clothing, they would stop and translate. And that's what the board did here. And the board properly applied the doctrine of word equivalence to find that vetements is generic. What if it's true that 0.5% of the American public knows French? Who are we really protecting then under those circumstances? Is it so de minimis perhaps that we shouldn't even worry about this because we're trying to understand this question of genericness and descriptiveness through what the lens of the ordinary American purchaser. And then under these circumstances, if it's true that only 0.5% of the American public knows this language, then, you know, maybe from the ordinary American purchaser's vantage point, why they wouldn't ever consider translating this because they don't know the language. Your Honor, there's a lot to unpack in that. So I'll start with, if it's 0.5% of the population that speaks French, yes, we still care. Because when we're talking about a genericness and a descriptiveness inquiry, as you pointed out, we're concerned about what the significance of that word is. And if we go back to Holushka, which, sorry, Weissnudel, which discussed the word Holushka, which is Hungarian, they didn't, the court that did not say, oh, we are concerned about how many people, it just said that the generic word, whether in English or a foreign language, is not registrable. And so we're here to protect the public and to make sure that generic words are not taken out of the public domain, to make sure that no one is granted an exclusive right to use words that everyone is entitled to. And so when we're talking about percentage, we still look through that lens, through that lens of however many people are knowledgeable in French and ask, is Vetements, the direct and literal translation, to clothing? It is. Those consumers, through their eyes, that's what we're worried about. We're worried about, will they look at Vetements on clothing and think, I'm just seeing the word clothing on clothing. And that's what the record here demonstrates, and that's what the board found, that Vetements is generic for clothing and online retail store services featuring clothing. So back to the ordinary American consumer standard, what's the right way to articulate that? Is it the ordinary American public consumer includes people that speak French, and then we immediately run to see, because French is a common language, whether those, that subset of American purchasers, the ones that speak French, would understand this term to be generic or descriptive? Yes, Your Honor. But we don't do that for 2E3. No, Your Honor, and that's because when we're talking about the primarily geographically deceptively misdescriptive issue, there is a question of whether a significant portion of the population would be deceived. And if that deception hinges on whether the consumer understands what that foreign term means, then you're looking at a percentage. That's when this court has said that a proportionality test is appropriate. And in spirit, and footnote five, the court actually noted that that analysis is distinct from how the doctrine of foreign equivalence is presented in cases like Weissnudel, in cases like Northern Paper Mills, the situation where we have here. Judge Post earlier asked a question about, that might have suggested whether we should think about 2D likelihood of confusion cases, perhaps differently from questions like genericness or descriptiveness. And perhaps in the confusion context, maybe we need to think a little harder before we immediately do a translation. Because Palm Bay was the case where we, this court concluded that a consumer, even one that knew the language, wouldn't stop and translate that particular foreign word into English. And so do you see any daylight in terms of how we do the inquiry between 2D and genericness and descriptiveness? Yes, Your Honor. I agree with Judge Post in that Palm Bay was a different inquiry. When we're talking about the doctrine of foreign equivalence and whether a consumer is likely to translate in that likelihood of confusion analysis, we're asking whether they are likely to translate and then compare it to another term. And as this court pointed out, there are circumstances in which a consumer, in that context of looking at this mark and then being asked to compare it to another, might not stop and translate. And I think we've pointed out some cases, for example, Tia Maria before the board, where they were comparing Tia Maria as used for Mexican restaurant services versus Aunt Mary's for canned goods. Okay, we have a different test for 2E3. I know that. Does the PTR want a different test between 2D confusion and genericness and descriptiveness? I think that- Or do you want the same test? The test that we have now. Well, I can't say whether it's a different test or it's... But what we have is very clear precedent that we follow that says the foreign language term that is the direct equivalent of a generic English term is not registrable. And if that's what this court writes for a 2E1 descriptiveness or a genericness refusal, then that we believe would be consistent with the precedent and is something that the USPTO would be applying and is already applying. It's not a absolutely rigid rule. I mean, our precedent has been clear that that's the sort of standard, but we can deviate from that under appropriate circumstances, right? That is correct. The standard is if it's a common modern foreign language. So yes, it is not applied strictly across all languages. And it has to be a direct and literal translation. So Your Honor, we are not just going to apply it no matter the circumstances, but would adhere to the precedent that we have, I believe in any way. But you know, that was all true in Palm Bay, right? It's a modern common language and everything else, but nevertheless, we concluded that, you know, the foreign speaker wouldn't translate the term. So there are exceptions. Yes. And there would also be exceptions for genericness and descriptiveness? As far as, I don't think so, Your Honor, because as far as the precedent goes for genericness and descriptiveness. So there is a different test then. For confusion, there's exceptions. For genericness and descriptiveness, no exceptions. You go with the rigid rule. You go with the inflexible, rigid, hard and fast bright line rule. Well, does it make a difference that in Palm Bay, the foreign language descriptor was a pronoun? It could have been, instead of the, it could have been madame, please go. And whether a foreign language speaker would look at that and translate it is, it would be unusual to translate it because they simply take it as a pronoun. Love is widow. It's also a pronoun in that context. The way that we read Palm Bay is that when you're faced with Veuve Clicquot or Veuve Royale on a bottle of wine or champagne, there is no relationship between Veuve and wine. And so therefore, even the ordinary American purchaser who is familiar with French may not be likely to stop and translate. It is a different approach, I think, when we have the descriptiveness and genericness inquiry, because what we have is the word of, the name of the thing on the thing. You have Vetements on clothing. And so it is likely because it is that direct and literal translation of the name of the thing that the consumer would stop and translate. To take your friend's logic to its logical extent, you should be applying that test to English as well so that the direct French transliteration to English is vestment, which is an English word. And if somebody names their product vestments, do you look at it and say, gee, we don't think but 1% of the English-speaking Americans would understand that word, because that's where the logic goes. Your Honor, I think that logic would really do harm to our descriptiveness and genericness refusals, because we don't ask how many people will know what the meaning of the word is. We ask what is the meaning of the word and is it merely descriptive? Is it generic for the goods and services? So I would reject that line. Anything else? No, Your Honors, and I would just ask that you affirm the Board and their application of the Doctrine of Foreign Equivalence to the Vetements applications. Thank you. Thank you. Your Honors, two very quick points. This Court is well aware that by registering the trademark to Vetements, it does not take the word clothing out of the hands of competitors or anybody else from using it. It also doesn't take the word Vetements in the French language out of people being able to use it as a generic or descriptive term, if that's what they're doing. If you're speaking French, you're gonna use the word Vetements. When you're selling products and using it in a trademark fashion, that's a different thing, and that's what the discussion is here about. Now, this likely to translate test? What about the sign in the store in New Orleans or Baton Rouge or up in North Maine in Bath that has a section where it says Vetements? If they do, I've got no evidence or record of that. That would be news to me, but it would. I just don't know. I, that could have an impact. If that were on this record, I'd have to address it, but I can't address it because I just don't know the mechanism under which that is actually happening. Our understanding from the record is nobody's using the French word Vetements, but this likely to translate standard or test, that as stated- Not as a trademark, as a generic sign in the department store for their clothing department, because they translate, because it's New Orleans or Baton Rouge or up in Bath, Maine, a substantial portion of their customers speak French as their local language. Based on that hypothetical, if they have all the signs inside a store in the French language- French and English, yeah. So French and English- They want clothing, yeah. Okay, well, then perhaps people would see it. I'm not aware of it. I don't, the usage as a descriptor or generic term isn't precluded by a trademark registration. You can always continue to do that. But here, the likely to translate test, in race spirit says it's a threshold limitation on applying the doctrine of foreign equivalence. It's, it is, it is fundamental and it's before you even get to it. Thank you. Thank you very much. Thank you. We thank both sides for the cases submitted.